# EXHIBIT A

DECLARATION OF JANAKI RANGASWAMY

    I, JANAKI RANGASWAMY declare as follows:

1.    I am employed by the United States Citizenship and Immigration Services (hereinafter "USCIS") as Supervisory Center Adjudications Officer (SCAO), at the California Service Center (CSC) in Laguna Niguel, California.  I have been employed as an SCAO since November 2005 and have been employed in other capacities by the agency since May 1992.  I am currently the supervisor of the N-400 unit which is responsible for overseeing the intake processing of N-400 Applications for Naturalization from initial receipt of the application by the CSC through the receipt of FBI name check clearances and scheduling the naturalization examination or interview in the USCIS district or field office where the applicant resides.

2.    This declaration is submitted in support of Defendants' Motion to Dismiss or Alternatively to Remand in the case of <u>Khosravani v. Chertoff</u>, 08CV0220-W, currently pending in the Southern District of California.   This declaration provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file. As Supervisor of the N-400 unit at CSC, I am in charge of the team that monitors and oversees the intake processing of the N-400 application for naturalization involved in this litigation.  The information below is based upon review of the files, electronic records, personal knowledge, and other information that has become known to me in the course of my official responsibilities concerning the processing of this application.

3.    The CSC is responsible for the receipt, processing and adjudication of certain immigrant and nonimmigrant visa petitions and other applications filed by petitioners and applicants residing in the western United States as well as certain forms and petitions transferred from other Service Centers. The CSC averages 115,915 completions per month, including the receipt of and initial processing of N-400s prior to their transfer to local district offices.  During Fiscal Year 2007, the CSC oversaw the initial receipt of 401,050 N-400s

for an average of 33,421 per month and completed the initial processing of 227,165 N-400s.

4.      There are four Service Centers throughout the United States, each of which has jurisdiction over certain types of applications and petitions either filed within their respective geographic areas or assigned to them as part of a national bi-specialization effort.   The four Service Centers combined average 387,776 receipts per month, or 4,265,536 in the last eleven months.  Some Service Centers are the sole adjudicators of certain types of petitions; for instance the Nebraska Service Center adjudicates all refugee adjustment applications and all NAFTA applications, whereas the Vermont Service Center adjudicates all battered spouse applications.  The Service Centers fulfill part of the USCIS responsibility to adjudicate benefits applications and are allocated part of the USCIS adjudication resources.  In order to maximize productivity, the Service Centers have no public interface and process and adjudicate only petitions and applications that do not require personal interviews.  Additionally, Service Centers do initial receipt, file creation, security clearances and processing of some petitions and applications that do require personal interviews prior to their relocation to USCIS District Offices.  This includes Form N-400, Application for Naturalization, and Form I-589, Application for Asylum and for Withholding of Removal.

5.      When a visa petition or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks.  These checks are conducted both to enhance national security and ensure the integrity of the immigration process.  These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently.  These security checks have yielded significant derogatory information about alien applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism.  This has resulted in the alien

being found ineligible for the immigration benefit and USCIS's denial of the application or petition. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States.

6.    The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection System (IBIS). The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement agencies that contain information that is not necessarily revealed by the FBI's fingerprint check or IBIS. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the results of an IBIS query are usually available immediately, in some cases information found will require further investigation. Finally, FBI fingerprint checks provide information relating to criminal background within the United States. Results are usually received within days and while the vast majority result in no criminal record, positive results may have a direct bearing on the eligibility of an applicant for the

immigration benefit being sought.

7.   The FBI has an established process of processing FBI Name Check requests from USCIS
     chronologically based on the date the request is forwarded.  Since September 11, 2001,
     USCIS has submitted millions of name check requests to the FBI, thus taxing that
     agency's resources and creating a backlog in FBI's performance of complete security
     checks.  During the initial submission period of December 2002 and January 2003,
     USCIS submitted almost 3 million names to the FBI.  As of May 2007, USCIS had
     approximately 329,160 pending FBI Name Check requests with approximately 32
     percent pending more than one year.

8.   Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and
     thorough background checks on aliens who are seeking immigration status in the United
     States has required procedures that sometimes result in individuals not receiving their
     documents and benefits as quickly as in the past.  In order to ensure national security and
     public safety, as well as to reduce the waiting time for adjudication and documentation
     of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and
     implement improved procedures that will ensure that all of the background checks are
     completed and the results considered as quickly as possible.  However, the public safety
     requires USCIS to make certain that the checks have been done before it adjudicates any
     application or petition and before it issues any immigration status documents to such
     persons.  Accordingly, pursuant to established agency policy, all required security
     checks must be completed prior to adjudication of the application.

9.   For most applicants, USCIS can quickly determine if there are criminal or security
     related issues in the applicant's background that affect eligibility for immigration
     benefits.  However, due to the sheer volume of security checks USCIS conducts, and the
     fact that USCIS must await responses from the FBI or other relevant agencies that
     conduct some of the required security checks, some delays on individual applications are
     unavoidable  and may be lengthy.  Moreover, in some cases a background or security

check will reveal that positive (derogatory) information on the subject alien is possessed by some agency other than USCIS without necessarily revealing the substance of that information.  In such cases, USCIS works closely with the other law enforcement or intelligence agencies to obtain all available information concerning the positive result in order to properly evaluate its significance. Even where the FBI or a third agency has provided a final response, a case may still be considered pending where the response requires further investigation or review by USCIS or another agency.   It is vitally important to thoroughly screen each applicant in order to resolve all concerns of a law enforcement or national security nature before determining that an individual is eligible for an immigration benefit.

10.    USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision on his or her application or petition and to receive evidence of his or her immigration status.

11.    Since only aliens who are lawful permanent residents may apply for naturalization, all applicants for naturalization already have a previously created permanent immigration file (A-file) which houses their application for permanent residence and related files. Once USCIS receives a N-400 Application for Naturalization, the application is keyed in, placed into a receipt folder, a T-file (temporary file) is created and the A-file is requested electronically through the Central Immigration System ("CIS").  The T-file is placed on a N-400 shelf until the A-file is received and the N-400 is then consolidated into the permanent A-file.  Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a FBI name check request by the CLAIMS 4 (Computer Linked Access Information Management System) via FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. That electronic transmission of the FBI name check request by CLAIMS 4 is done automatically when the N-400 is first received and keyed in at the Service Center and

before the N-400 is placed on the N-400 shelf to await completion of all necessary security checks, including the FBI name check, and request by the local USCIS district offices for transfer of N-400s ready for interview and adjudication.  N-400s are separated on the N-400 shelf by local district offices in accordance with the geographic location of the applicant and generally in chronological order according to date of receipt.

12.     The FBI Name Check Quality Assurance desk of USCIS Service Center Operations issues a report to the CSC once or twice a month to identify N-400 applications that have received a "No Data" or "Error" response indicating a problem with transmission of the name check request from USCIS to the FBI.  If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response.  In this way USCIS ensures that the FBI has in fact received all requests for name checks.  Additionally, the CSC N-400 unit runs C4 Workflow Current Activity Report monthly or more often as needed. In addition to other queries, this report identifies those case queries for those N-400 applications pending at the CSC which have an FBI name check response "ERROR".  If more than 60 days have elapsed since the FBI response date, then these cases are entered into a spreadsheet and re-submitted to the FBI. The CSC also runs a RAFACS report approximately at least every other month that audits or "sweeps" all pending N-400s located at the CSC to determine the current status and to identify and resolve any problems.  This report is reviewed to ensure that all necessary fingerprints and security checks, including the FBI name check, have been transmitted properly.  FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending".   An FBI Name Check that has been completed will be indicated by various entries depending on the result, including No Record, Positive Record, etc.

13.     These reports do not provide USCIS with any information as to what information the FBI may have relating to a particular alien, whether an FBI investigation into the particular alien has been undertaken, or whether there are national security concerns relating to that

alien.  Once a response is received from the FBI, that information is automatically uploaded in CLAIMS 4.  Once the FBI name check and other security checks are completed, CLAIMS 4 automatically moves the N-400 into an interview queue.  The N-400s then remain in the interview queue to await scheduling of interviews by the district offices.  District Offices request the transfer of N-400s from the CSC from the interview queue by a "pick list" in accordance with their available adjudication resources and workload.  Once an N-400 is requested by a district office the file is pulled by a contractor and is transferred to the district office in time for interview and adjudication there.

14.     USCIS has a process for expediting processing of certain applications and petitions.  It is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date.  If, for example, USCIS asks the FBI to expedite a name check in a particular case, this action comes at the expense of other name check cases because the FBI would have fewer resources with which to work other pending cases.

15.     In order to address in a consistent and fair manner the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in the following situations:

1.  Military Deployment.

2.  Age-out cases not covered by the Child Status Protection Act and applications affected by sunset provisions such as the Diversity Visa Program.

3.  Compelling reasons provided by the requesting office such as critical medical conditions.

4.  Loss of Social Security benefits or other subsistence at the discretion of the Director.

16.     To my knowledge, Plaintiff has not made a formal request for expedited processing. Moreover, U.S. Citizenship and Immigration Services (USCIS) will not routinely request the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

17.     USCIS reports the average processing times for specific applications and petitions on the USCIS website. This information reflects only average processing times on the date the information is published. Average processing times fluctuate widely and will sometimes even regress for a specific form time due to a number of factors, including a reallocation of agency resources, reordering of the agency's priorities, and other reasons. Additionally, not every application will require the same level of inquiry. Some may require a more detailed level of review and or investigation from either the USCIS or other agencies for a number of reasons ranging from the alien's eligibility for the benefit sought to national security concerns. Accordingly, even when it appears that the adjudication of a particular application is outside the average processing time, this does not establish that the delay is unreasonable or even due to factors within the control of the agency.

18.     There is no statutory or regulatory time limit for the adjudication of N-400s. Moreover, during the continued pendency of a naturalization application, the alien retains all of the rights and benefits of a permanent resident of the United States, including the right to live and work in this country and to travel freely abroad. Thus, applicants for naturalization are not as adversely affected by delays in the adjudication of their applications as are aliens filing for other immigration benefits.

19.     In my capacity as Supervisory Center Adjudication Officer of the CSC, I have access to the official files and records of the USCIS. I have reviewed the system records for plaintiff Reza KHOSRAVANI, A55 126 378. Plaintiff Khosravani is a native and citizen of Iran. His status was adjusted to that of a Lawful Permanent Resident (LPR) of the United States on December 12, 2001. On September 20, 2006, he filed an initial N-

400 Application for Naturalization with the California Service Center. On October 10, 2006, the results of Plaintiff's FBI fingerprints check were received by USCIS. Plaintiff has not been yet scheduled for an interview on his application for naturalization.

20.    On September 28, 2006, a request for background security name check was submitted electronically to the Federal Bureau of Investigation. As of today's date, the name check for the plaintiff remains pending with the FBI.

21.    In accordance with 8 CFR § 335.2(b), in the absence of a "definitive response" from the FBI with regard to the name check request, the plaintiff may not be scheduled for a naturalization interview and `his case remains in a holding status.

22.    Once the required security checks are completed, including the FBI name check, plaintiff's N-400 application will immediately be placed in the electronic queue to be scheduled for an interview in the Sacramento District Office or the appropriate sub-office on the first available date in that location. The CSC will also immediately transfer the A-file to the place where the interview will take place. In the event that the FBI eventually reports a "positive response" or "PR," significant additional time would likely be required while USCIS learns the precise nature of the positive information and determines whether it would have any bearing on the outcome of the adjudication. Until such time as all security checks are complete, USCIS is unable to complete the processing and adjudication of this N-400 application.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of April, 2008 at Laguna Niguel, California.

JANAKI RANGASWAMY
Supervisory Adjudication Officer
California Service Center

*Press Office*
**U.S. Department of Homeland Security**



# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# EXHIBIT B

1

2

3

4

5

6

7

8

9                          **UNITED STATES DISTRICT COURT**

10                         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12    LEI ZHOU,                                    CASE NO. 07cv0102-LAB (NLS)

13                                Plaintiff,        **ORDER VACATING HEARING**
                                                   **AND REMANDING**
14            vs.                                  **ADJUDICATION OF**
                                                   **NATURALIZATION APPLICATION**
15    MICHAEL CHERTOFF, Secretary;
      EMILIO GONZALEZ, Director; PAUL
16    PIERRE, District Director, Department of
      Homeland Security, and ALBERTO
17    GONZALEZ, Attorney General,

18                                Defendants.

19          Lei Zhou ("Zhou"), proceeding through counsel, has filed a Complaint for a hearing

20    to decide her naturalization application.  She represents she successfully passed her the

21    History and Government examinations on September 28, 2004, but the government

22    defendants have failed to timely adjudicate her application. She represents she has inquired

23    as to the status of her application at approximately six-month intervals since her

24    examination, receiving the response each time that Defendants continue to await "some kind

25    of background check or security check."  Compl. ¶ 5.

26          Zhou's application for naturalization has been pending for over two years since her

27    initial examination.  She is entitled to ask this court to take jurisdiction of the matter and to

28    decide her application judicially pursuant to 8 U.S.C. § 1447(b), setting a 120-day period

1 from the date of that examination within which the agency must decide a naturalization

2 application.[1]

> If there is a failure to make a determination under section 1446
> of this title before the end of the 120-day period after the date on
> which the examination is conducted under such section, the
> applicant may apply to the United States district court for the
> district in which the applicant resides for a hearing on the matter.
> Such court has jurisdiction over the matter and may either
> determine the matter or remand the matter, with appropriate
> instructions, to the Service to determine the matter.

8 8 U.S.C. § 1447(b).

9    In response to the court's Order To Show Cause regarding Zhou's Complaint, the

10 defendants filed responsive briefing, urging the court to "remand the matter, with appropriate

11 instructions" to the United States Citizenship and Immigration Services ("CIS") to adjudicate

12 the petition, rather than to itself decide the citizenship question.  Resp. 2:1-12, *quoting* 8

13 U.S.C. § 1447(b).  Defendants represent they are still awaiting the necessary background

14 check results from the FBI investigation in Zhou's case, and that any adjudication of her

15 naturalization application in this circumstance, whether by the court or by the agency, would

16 be based on an incomplete record.  Defendants provide the declaration of  Victoria Porto,

17 a CIS employee whose duty, among others, is to research and monitor CIS case records.

18 Resp. Ex. A, ¶ 1.  She avers, among other things, she has investigated the possibility of

19 requesting expedition of Zhou's background investigation and has determined her application

20 does not qualify under December 21, 2006 USCIS guidelines.  Resp. Ex. A, ¶ 12.

21    Zhou filed a Reply to the government's Response, opposing the remand option.  She

22 argues she has done everything required of her, and if the matter were remanded, the

23 government would remain in complete control, as it has been throughout the delay since her

24 September 2004 examination.  She also argues the government should be required to inform

---

26    [1]    Most courts have construed that period as commencing on the literal *date* of that
27 examination as a discrete event (rather than as a process incorporating the entire investigative
activity), consistent with the statutory text according district court jurisdiction 120 days after "the date
28 on which the examination is conducted."  8 U.S.C. § 1447(b).  Courts have also supported that
construction through inferences from the organization of 8 U.S.C. § 1446, implying that the
"investigation" of the applicant is separate from the "examination" of the applicant.

1   the court if anything has surfaced in the course of the investigation that could justify a failure

2   to conclude her case. As there appears to be nothing, she argues the court should accept

3   jurisdiction and decide her application.

4       Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues presented appropriate

5   for decision on the papers and without oral argument. Accordingly, the March 19, 2007

6   hearing is **VACATED**. For the reasons discussed below, the court declines to adjudicate

7   Zhou's application in the absence of a completed security investigation and **REMANDS** her

8   naturalization proceedings to the CIS

9       The FBI and CIS are charged with investigating and adjudicating naturalization

10  applications. 8 U.S.C. § 1446(a). Congress mandated in 1997 that the FBI investigate every

11  applicant for naturalization and that CIS await completion of those investigations before

12  rendering a decision with respect to any applicant. *See* Pub. L. No. 105-119, Title I, Nov.

13  26, 1997, 111 Stat. 2448. In particular, beginning in fiscal year 1998 and thereafter, the then

14  Immigration and Naturalization Service ("INS") (now CIS) is prohibited from using any of the

15  funds appropriated or available to it "unless the [CIS] has received confirmation from the

16  (FBI) that a full criminal background check has been completed . . . ."[2]  Id. Pursuant to that

17  provision, the INS amended 8 C.F.R. § 335.2 to reflect the need to delay conducting an

18  applicant's initial citizenship interview until after the FBI completes its investigations. The

19  government respondents here, and in a number of similar cases before this and other district

20  courts, acknowledge:

21          Until recently, many CIS offices, including the San Diego
            office, had acted contrary to the regulation by conducting an
22          initial interview of the applicant to conduct the history and
            English examinations before awaiting the results of the FBI
23          investigations.   Depending  upon  the  results  of  the  FBI

24

25  [2]  "A definitive response that a full criminal background check on an applicant has been
    completed **includes**: (1) Confirmation from the Federal Bureau of Investigation that an applicant
26  does not have an administrative or criminal record; (2) Confirmation from the Federal Bureau of
    Investigation that an applicant has an administrative or criminal record; or (3) Confirmation from the
27  Federal Bureau of Investigation that two properly prepared fingerprint cards (Form FC-258) have
    been determined unclassifiable for purpose of conducting a criminal background check and have
28  been rejected." 8 C.F.R. § 335.2(b) (emphasis added). This court, like others, finds a "name check"
    is reasonably read into the requirement of a "full criminal background check" based on the non-
    limiting term "includes."

1
2
3

> investigation, CIS would interview the naturalization applicant. However, FBI investigations have taken much longer over the past few years, so the adjudications of naturalization applications have been increasingly delayed. Accordingly, applicants have turned to 8 U.S.C. § 1447(b).

4   Resp. 3:28-4:5.

5       When CIS proceeded with the initial examinations of applicants before receiving the

6   results of the required FBI investigations, it prematurely triggered the 120-day decision

7   period. *See* Khelifa v. Chertoff, 433 F.Supp.2d 836, 841-42 (E.D.Mich. 2006) ("[T]he court

8   concurs in the weight of authority holding that the 120-day statutory decision making period

9   commences when an applicant 'appears in person before a Service officer' as provided in

10  the CIS regulation that governs examinations. 8 C.F.R. § 335.2"), *citing* El-Daour v. Chertoff,

11  417 F.Supp.2d 679, 683 (W.D.Pa. 2005) (concluding that "examination" means "interview);

12  *see also* Shalabi v. Gonzales, 2006 WL 3032413 (E.D. Mo. Oct. 23, 2006); Stepchuk v.

13  Gonzales, 2006 WL 3361776 *2 (W.D. Wash. Nov. 17, 2006) ("The Court agrees with this

14  persuasive authority and similarly concludes that the 120-day period in § 1447(b)

15  commences on the day of the applicant's examination interview with a USCIS officer").  To

16  avoid the problem in future, CIS has now conformed its interview process to the regulatory

17  timing mandate by awaiting completion of the FBI background investigations -- over the

18  timing of which CIS has no control -- before conducting initial interviews of naturalization

19  applicants. Id. 4:11-14.

20      However, a number of applicants, including Zhou, remain among those whose initial

21  examinations occurred before the procedure to await FBI investigation results was strictly

22  applied.  The district court has technical jurisdiction over cases like hers, where more than

23  120 days have passed since the CIS' initial examination of the applicant but where the

24  processing of his citizenship application is stalled pending the results of the FBI's

25  investigations.  *See* United States v. Hovsepian, 359 F.3d 1144, 1164 (9th Cir. 2004)

26  (holding "Section 1447(b) allows the district court to obtain exclusive jurisdiction over those

27  naturalization applications on which the INS fails to act within 120 days if the applicant

28  properly invokes the court's authority").  Once jurisdiction is established, 8 U.S.C. § 1447(b)

1  gives the court two options: hold a hearing and decide the matter, or remand the matter with
2  appropriate instructions to the CIS for determination. Prudentially and practically, this court
3  is persuaded to exercise its remand option rather than itself to adjudicate the application on
4  incomplete information.

5          "Generally speaking, a court . . . should remand a case to an agency for decision of
6  a matter that statutes place primarily in agency hands." INS v. Ventura, 537 U.S. 12, 16
7  (2002). In immigration matters, the executive branch is accorded great deference, as
8  evidenced by the statutory and regulatory schemes established for processing citizenship
9  applications. Neither the CIS nor the district court is sufficiently informed to decide an
10 application until the FBI completes the required criminal background check to determine
11 whether an applicant presents any national security or public safety risk, nor are they
12 equipped to conduct such investigations themselves. See El-Daour, 417 F.Supp.2d at 684;
13 Shalabi, 2006 WL 3032413 at *4. When the delay in the citizenship decision results from
14 the FBI's investigative process, this court finds it is inappropriate to make a determination
15 before that information is known, absent abusive or egregious circumstances not present on
16 this record. See Khelifa, 433 F.Supp.2d at 843 ("[T]he courts have been unwilling to pursue
17 either of these two courses [i.e., either to conduct their own investigations into an applicant's
18 criminal background, or to proceed to the merits of the application without the benefit of
19 information concerning the applicants' backgrounds or security risks] where they could
20 instead remand with instructions for the CIS to promptly decide the applications"). To do
21 otherwise, "we would be improvidently bypassing the agency's expertise in immigration
22 matters committed in the first instance to the agency." Lopez v. Ashcroft, 366 F.3d 799, 807
23 (9th Cir. 2004). Moreover, as "only the FBI and the CIS are in a position to know what
24 resources are available to conduct the background checks and whether an expedited
25 background check is feasible or efficient" in a particular case (Shalabi, 2006 WL 3032413
26 at *5), the court declines to impose particular deadlines for the completion of the FBI checks
27 or the naturalization decision. The court notes this decision does not deprive Zhou of judicial
28 review, because if her application is ultimately administratively denied, she may return to

1  court for a *de novo* review.  *See* 8 U.S.C. § 1421(c). The court would, at that time, have the

2  benefit of a final and complete administrative record.

3          For the foregoing reasons, **IT IS HEREBY ORDERED**:

4          1.      This matter is **REMANDED** to CIS, with instructions that CIS make a

5  determination as expeditiously as possible after the completion of Zhou's security and

6  background investigation.

7          2.      The scheduled hearing of this matter is **VACATED**.

8          **IT IS SO ORDERED**.

9  DATED:  March 13, 2007

10

11          **HONORABLE LARRY ALAN BURNS**
           United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibits to Motion to Dismiss or Remand 30

07cv0102

# EXHIBIT C

1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   MOHAMMAD HASSAN DAIRI,                    CASE NO. 07cv1014 JM(JMA)

12                              Plaintiff,     ORDER GRANTING MOTION TO
                                               DISMISS
13        vs.

     MICHAEL CHERTOFF, Secretary, et al.,
14
                                Defendant.
15

16        Defendants Michael Chertoff, Secretary of the Department of Homeland

17   Security, Emilio Gonzalez, Director of the Bureau of Citizenship and Immigration

18   Services ("USCIS"), and Alberto Gonzalez, Attorney General, move to dismiss the

19   complaint for lack of subject matter jurisdiction or, alternatively, to remand the action

20   to USCIS.  Plaintiff Mohammad Hassan Dairi opposes the motion.  Neither party

21   requests oral argument and, pursuant to Local Rule 7.1(d)(1), the court finds this matter

22   appropriate for decision without oral argument.  For the reasons set forth below, the

23   court dismisses the action for lack of subject matter jurisdiction.

24                              **BACKGROUND**

25        On June 5, 2007 Plaintiff commenced the present action seeking relief in the

26   nature of mandamus to compel Defendants to move forward with processing his

27   application for naturalization. Plaintiff is a lawful permanent resident of the United

28   States and is a citizen and native of Jordan.  (Compl. ¶1).  Plaintiff filed his first

1  application for naturalization in 2004 but subsequently withdrew that application.  On

2  May 4, 2006 Plaintiff filed his second application for naturalization on Form N-400.

3  Plaintiff alleges that he made "countless" inquires regarding the status of his

4  naturalization application and was informed "that his applications had been held up

5  because of some kind of 'background' investigation." (Compl. 5).

6  Plaintiff alleges that the Government "had has ample opportunity to investigate

7  the 'background' of this Plaintiff." (Compl. ¶6). Plaintiff also sets forth data from the

8  USCIS website indicating that the USCIS "is now processing for interview

9  naturalization applications that it received on or before October 12, 2006," and that he

10  has not yet been interviewed. (Compl. ¶7).  Plaintiff requests that Defendants be

11  compelled "to move forward with Plaintiff's application for naturalization and schedule

12  him for interview." (Compl. at p.3:18-19).

13  Defendants move to dismiss the complaint on the ground that mandamus relief

14  is unavailable as Plaintiff's naturalization application is in the process of adjudication

15  and remains in the background investigation phase.  Plaintiff opposes the motion.

## DISCUSSION

17  Defendants challenge the subject matter of the court to entertain this action under

18  28 U.S.C. §1361 and  move to dismiss the complaint pursuant to Rules 12(b)(1) and

19  (12(b)(6).[1]  "Mandamus is an extraordinary remedy and is available to compel a federal

20  official to perform a duty only if: (1) the individual's claim is clear and certain; (2) the

21  official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free

22  from doubt, and (3) no other adequate remedy is available." Kildare v. Saenz, 325 F.3d

23  1078, 1084 (9th Cir. 2003).   The parties focus on the first and second elements.

24  Here, Defendants have satisfied their evidentiary burden to show that Plaintiff's

25  application for naturalization is in the process of adjudication and therefore Plaintiff's

---

27  [1] The parties are in general agreement that subject matter jurisdiction, if it exists at all, would

28  only be appropriate under the Mandamus Act, 28 U.S.C. §1361.  The Mandamus Act vests the district courts with original jurisdiction of "any action in the nature of mandamus to compel an officer or employee of the Untied States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. §1361.

1   claim is neither clear and certain nor one subject to nondiscretionary, ministerial duties.

2   While Defendants have the nondiscretionary duty to adjudicate Plaintiff's application,

3   the USCIS, the FBI, and other federal agencies have a great deal of discretion in how

4   they process the Congressionally mandated background investigation. Defendants

5   submit the declaration of Janaki Rangaswamy, supervisor of the N-400 unit responsible

6   for overseeing the processing of N-400 applications from the initial receipt of the

7   application through the receipt of the FBI name check clearances. Mr. Rangaswamy

8   declares that Plaintiff filed his N-400 application on May 4, 2006 and that a request for

9   a background security name check was submitted to the FBI on May 17, 2006. He also

10  declares that the FBI name check remains pending and that continued monitoring of

11  Plaintiff's N-400 application reveals that "the FBI query continues to return its current

12  response of 'pending' or 'IP,' [and] this agency's hands are tied, and we are unable to

13  move beyond this point." (Rangaswamy Decl. ¶6; Supp. Decl. ¶7).

14      Further, there appears to be no legal basis for the court to exercise subject matter

15  jurisdiction over the action to compel Defendants to proceed with the naturalization

16  interview. Defendants are precluded from proceeding with an applicant interview

17  (generally considered the final step in the naturalization examination process), as

18  requested by Plaintiff, until completion of the FBI background investigation. 8 C.F.R.

19  §335.2(b). Moreover, 8 U.S.C. §1421(c) only permits judicial review after the USCIS

20  has denied an application for naturalization and 8 U.S.C. §1447(b) permits judicial

21  review only after the examination is complete. Neither event has yet to occur to

22  empower this court to review Plaintiff's naturalization application or compel

23  Defendants to afford him an examination interview.

24      In sum, the totality of the circumstances, in light of Defendants' evidentiary

25  showing, fails to demonstrate the type of extraordinary circumstances which warrant

26  mandamus relief. See Kildare, 325 F.3d at 1084. The manner in which background

27  investigations are conducted are the types of discretionary functions not properly the

28  subject of mandamus actions. The evidentiary record establishes that Defendants are

already doing precisely what Plaintiff requests this court to compel – process his naturalization application.  Accordingly, the court concludes that it presently lacks mandamus jurisdiction over the Plaintiff's complaint.

The court dismisses the present action for lack of subject matter jurisdiction.[2] The Clerk of Court is instructed to close the file.

**IT IS SO ORDERED.**

DATED:  November 1, 2007

Hon. Jeffrey T. Miller
United States District Judge

cc:          All parties

---

[2] The court is sympathetic to Plaintiff's desire to naturalize.  However, in light of modern-day security concerns, Defendants are under heightened legislative obligations to conduct thorough background investigations of applicants prior to adjudicating applications for naturalization - - even if such background investigations result in substantial delays in naturalization.

# EXHIBIT D

1

2

3

4

5

6

7

8                        **UNITED STATES DISTRICT COURT**

9                        **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ROBERT YASMEH,                          CASE NO. 08-CV-0024 H
                                             (JMA)
12                              Plaintiff,
                                             **ORDER GRANTING**
        vs.                                  **DEFENDANTS' MOTION TO**
13                                           **DISMISS PLAINTIFF'S**
                                             **COMPLAINT**
14   MICHAEL MUKASEY, Attorney
     General of the United States;
15   MICHAEL CHERTOFF, Secretary of
     the Department of Homeland Security;
16   EMILIO T. GONZALEZ, Director of
     the United States Citizenship and
17   Immigration Services; ALFONSO
     AGUILAR, Chief of Citizenship,
18   United States Citizenship and
     Immigration Services; PAUL M.
19   PIERRE, District Director of the
     United States Citizenship and
20   Immigration Services, San Diego,
     California; ROBERT S. MUELLER,
21   III, Director of the Federal Bureau of
     Investigation,
22
                                Defendants.
23

24          On January 4, 2008, plaintiff Robert Yasmeh ("Plaintiff") filed a complaint

25   against defendants Michael Mukasey, Attorney General of the United States; Michael

26   Chertoff, Secretary of the Department of Homeland Security; Emilio T. Gonzalez,

27   Director of the United States Citizenship and Immigration Services; Alfonso Aguilar,

28   Chief of Citizenship, United States Citizenship and Immigration Services; Paul M.

Pierre, District Director of the United States Citizenship and Immigration Services, San Diego, California; and Robert S. Mueller, III, Director of the Federal Bureau of Investigation (collectively "Defendants"). Plaintiff's complaint seeks an order from this Court requiring Defendants to expedite Plaintiff's pending naturalization application. (Doc. No. 1.) On March 4, 2008, Defendants filed a motion to dismiss. (Doc. No. 4.) On March 25, 2008, the Court submitted Defendants' motion and vacated the April 1, 2008, hearing. (Doc. No. 5.) The Court exercises its discretion pursuant to Local Civil Rule 7.1(d)(1) to decide this matter without oral argument. For the following reasons the Court **GRANTS** Defendants' motion to dismiss.

## Background

Plaintiff, a native and citizen of Iran, entered the United States as a refugee in 1980. (Compl. ¶ 10.) On October 1, 1985, Plaintiff was granted Lawful Permanent Resident status. (Id.) On April 11, 2006, Plaintiff filed an application for naturalization. (Id. ¶ 12.) Plaintiff was fingerprinted for security checks on May 17, 2006. (Id. ¶ 13.) The USCIS and FBI have not yet completed Plaintiff's background security check. (Id. ¶ 15.) Because the USCIS has not completed the name check request, USCIS has not yet scheduled a naturalization interview for Plaintiff.[1] (Id.)

## Discussion

Federal courts are courts of limited jurisdiction and the burden of establishing that federal jurisdiction exists rests with the party asserting jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to bring a motion to dismiss a claim because the court lacks jurisdiction over the subject matter. Fed. R. Civ. P.

---

[1] The Court notes that Plaintiff states that an interview took place on October 18, 2005. (Compl. ¶ 20.) However, Plaintiff states elsewhere that USCIS "has not scheduled him for an interview." (Id. ¶ 15.) Defendants also state that USCIS has not interviewed Plaintiff. (Rangaswamy Decl. ¶ 19-21.) Furthermore, Plaintiff did not file the currently pending application until April 11, 2006, several months after the date of the alleged interview. (Compl. ¶ 12.)

1   12(b)(1).

2

3   **A.    Mandamus Jurisdiction**

4       "The district courts shall have original jurisdiction of any action in the nature of

5   mandamus to compel an officer or employee of the United States or any agency thereof

6   to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "Mandamus is an

7   extraordinary remedy and is available to compel a federal official to perform a duty

8   only if: (1) the individual's claim is clear and certain; (2) the official's duty is

9   nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3)

10  no other adequate remedy is available."  Kildare v. Saenz, 325 F.3d 1078, 1084 (9th

11  Cir. 2003).  Litigants may seek a writ of mandamus "to compel action, when refused,

12  in matters involving judgment and discretion, but not to direct the exercise of judgment

13  or discretion."  Idaho Watersheds Project v. Hahn, 307 F.3d 815, 832 (9th Cir. 2002)

14  (quoting Miguel v. McCarl, 291 U.S. 442, 451 (1934)).  Mandamus may also be

15  available where "a public official has violated statutory or regulatory standards

16  delimiting the scope or manner in which official discretion can be exercised."

17  AlliedSignal, Inc. v. City of Phoenix, 182 F.3d 692, 697 (9th Cir. 1999).

18      The Court concludes that section 1361 does not confer subject matter jurisdiction

19  over Plaintiff's claim. The actions Plaintiff seeks to compel are discretionary, not

20  ministerial.  Defendants have not refused to take action on Plaintiff's application or

21  exceeded a statutory or regulatory standard delimiting the scope of their discretion.

22  Congress has not established any time limits for the USCIS or FBI to conduct the

23  background investigations required under 8 U.S.C. § 1446.  Federal regulations also

24  provide no time frame within which USCIS must act on an application for

25  naturalization.  See 8 C.F.R. § 335.1.  On the contrary, section 1446 indicates that

26  Congress intended the executive branch and the relevant agencies to have broad

27  discretion in the manner in which they process naturalization applications.  For

28  example, the statute provides that "[t]he Attorney General may, in his discretion, waive

a personal investigation" in an individual case or class of cases.  8 U.S.C. § 1446(a) (emphasis added).

Furthermore, Congress has established a 120-day time frame for USCIS to make a determination on a naturalization application once it has completed the requisite background investigation and interviewed an applicant.  8 U.S.C. § 1447(b).  This section provides the applicant the right to a hearing before a district court if USCIS fails to "make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted."  <u>Id.</u>  The absence of such a time frame delimiting the pace of Defendants' action before the interview occurs, including conducting the required security checks, indicates that the pace of such action is within the discretion of the relevant agencies.

Defendants have provided the declaration of Janaki Rangaswamy, the Supervisory Center Adjudications Officer of USCIS's California Service Center.  (Rangaswamy Decl. ¶ 1.)  Rangaswamy declares that Plaintiff's naturalization application requires the completion of an FBI name check, FBI fingerprint check, and the Department of Health Services-managed Interagency Border Inspection System.  (<u>Id.</u> ¶ 6.)  These checks must be complete before USCIS may schedule an applicant for an examination.  <u>See</u> 8 C.F.R. § 335.2(b).  The FBI processes USCIS name check requests in the order in which USCIS transmits them to the FBI.  (Rangaswamy Decl. ¶ 7.)  Delays in processing applications are unavoidable and may be lengthy.  (<u>Id.</u> ¶ 9.)  Some cases involve complex or highly sensitive information and cannot be resolved quickly.  (<u>Id.</u> ¶ 6.)  Sometimes a name check will reveal the existence of information about the applicant without revealing the nature of that information.  In such cases, the USCIS must work closely with the other agencies to obtain all the relevant information and ascertain its significance.  (<u>Id.</u> ¶ 9.)  Furthermore, the large number of name check requests USCIS has submitted to the FBI since the terrorist attacks of September 11, 2001, along with new heightened screening procedures, have created a backlog and slowed the FBI's completion of the name check requests.  (<u>Id.</u> ¶ 7; <u>see</u> Decl. of Michael

A. Cannon ISO Defendants' Mot. ¶¶ 21-23.)  Rangaswamy states that the USCIS has yet to receive the results of Plaintiff's name check from the FBI and therefore cannot complete the processing of Plaintiff's application.  (Rangaswamy Decl. ¶ 19.)

Based on the foregoing the Court concludes that this is not a case where an agency declines or refuses to act.  Plaintiff's only grievance is that Defendants have not acted expeditiously enough.  The evidence establishes that the requisite investigation is ongoing. (See Rangaswamy Decl. ¶¶ 19-21.)  Defendants simply do not yet have all of the necessary information to adjudicate Plaintiff's application.  (Id.)  USCIS states that once it has the information it will promptly process Plaintiff's application.  (Id. ¶ 21.)  The Court concludes that the pace of the investigation and adjudication process before an interview occurs is discretionary and, therefore, that Defendants do not owe a ministerial duty to expedite the processing of Plaintiff's application.  Accordingly, this Court does not have subject matter jurisdiction over Plaintiff's mandamus petition under section 1361.

**B.      Plaintiff's Claim Under the APA**

The APA provides that, "with due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).  Also, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  Id. § 702.  This includes judicial review to "compel agency action unlawfully withheld or unreasonably delayed."  Id. § 706(1).  Plaintiff argues that Defendants have failed to complete processing of Plaintiff's naturalization application within a reasonable time and request an order compelling Defendants to expedite the processing and adjudication of Plaintiff's application.

"Failures to act are sometimes remediable under the APA, but not always."  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 61 (2004).  "[A] claim

1  under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take

2  a <u>discrete</u> agency action that it is <u>required to take</u>." <u>Id.</u> at 64 (emphasis in original).

3  This limitation rules out judicial direction of even discrete agency action that is not

4  demanded by law or agency regulations having the force of law. <u>See id.</u> at 65.

5  Therefore, under the APA a court may not compel an agency to act within a certain time

6  unless the agency is compelled by law to act within a specified period of time or the

7  delay is unreasonable. <u>Id.</u>; <u>see</u> <u>Coit Independence Joint Venture v. Federal Sav. and</u>

8  <u>Loan Ins. Corp.</u>, 489 U.S. 561, 590 (1989) (Scalia, J., concurring).

9      Here, no statute or regulation specifies a time period within which USCIS must

10  act with respect to the FBI name check and related background investigation. <u>Compare</u>

11  Pub. L. No. 108-458, § 3001(g), 118 Stat. 3638 (2004) (requiring personnel security

12  checks to be completed within a certain time frame). Additionally, Plaintiff has not

13  pointed to any statute or regulation that requires the FBI to complete the name check

14  in any period of time. The 120 day time limit for USCIS to make a determination on

15  an application from the date of the interview does not apply here because USCIS has

16  not yet scheduled an interview for Plaintiff.

17      Therefore, the only governing time limit is the APA's directive that agencies

18  resolve matters presented to them within a reasonable time. 5 U.S.C. § 555(b). This

19  provision clearly affords wide discretion to USCIS and the FBI regarding the pace of

20  the investigation component of adjudicating naturalization applications. <u>Cf.</u> <u>Wright v.</u>

21  <u>Califano</u>, 587 F.2d 345, 353-54 (7th Cir. 1978) ("Since administrative efficiency is not

22  a subject particularly suited to judicial evaluation, the courts should be reluctant to

23  intervene in the administrative adjudication process, absent clear congressional

24  guidelines or a threat to a constitutional interest."). Accordingly, the Court concludes

25  that the APA does not provide subject matter jurisdiction over Plaintiff's claim seeking

26  to expedite processing of his naturalization application.

27  / / / /

28  / / / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Conclusion**

For the reasons discussed, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's complaint.

IT IS SO ORDERED.

DATED:  April 1, 2008

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record.

- 7 -          Exhibits to Motion to Dismiss or Remand 43  08cv0024